# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

**HAROLD WAYNE JOHNSON**                        **CIVIL ACTION NO. 3:14-cv-3005**
      **LA. DOC #564291**

                                                **SECTION P**

**VS.**

                                                **JUDGE ROBERT G. JAMES**

**WARDEN BURL CAIN**                            **MAGISTRATE JUDGE HAYES**

## REPORT AND RECOMMENDATION

*Pro se* Petitioner Harold W. Johnson, a prisoner in the custody of Louisiana's Department

of Corrections, filed the instant Petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254

on October 13, 2014.  [doc. # 1].  Petitioner attacks his second degree murder conviction and the

life sentence imposed by the Fourth Judicial District Court, Ouachita Parish.  This matter has

been referred to the undersigned for review, report, and recommendation in accordance with the

provisions of 28 U.S.C. § 636 and the standing orders of the Court.

## Background

The underlying facts in this case have been set forth by the Louisiana Second Circuit

Court of Appeal as follows:

> Defendant and Ms. Johnson were high school sweethearts who had a child together.
> The two separated and Defendant enlisted in the army. Following his discharge from
> the service for reasons related to substance abuse, Defendant and Ms. Johnson
> reunited in 2004 and married in 2007. They lived together in a townhome in Monroe,
> Louisiana, with their two grandchildren and Ms. Johnson's young adult daughter,
> Kendra Barral. Defendant and Ms. Johnson had a tumultuous relationship. According
> to Kendra, the couple argued frequently over "money, his drug use, him staying out
> late, him just leaving and not coming home." Until the night of Ms. Johnson's death,
> the arguments had never resulted in violence. In May 2008, Defendant wrote his wife
> this letter:
>
>> Hey if our relationship, marriage, or whatever, is going to be like this. Me not
>> trusting U or U not trusting Me. Let stop f* * * * *g with each other before

somebody get badly hurt one way or another.

It don't have to be this way or that.

U for me me for U

Me for me U for U

We got in it together & we can get out together without the name calling, fussing, fighting, lying on each other.

Our problems should have been our problems

Every body know our business

CHILDNESS

I AM TIRED

Ms. Johnson owned a handgun that she kept in her purse, but in mid-June 2008, the gun was missing and was reported stolen. Ms. Johnson then began to carry a baseball bat in her truck. In addition, Defendant's drug abuse continued; he drank and used crack cocaine despite efforts by Ms. Johnson to get him to stop.

At about 10:30 p.m. on the evening of Saturday, August 2, 2008, Ms. Johnson drove her truck to pick up Kendra from work. The two women went back to the townhouse to wait for the father of one of the grandchildren, Anthony Rogers, to pick up the children. When Rogers arrived and took the children, it was late and Defendant had not yet arrived home. Ms. Johnson and her daughter left the townhouse and went searching for Defendant, but were unable to locate him. At approximately 12:15 a.m., Ms. Johnson dropped Kendra off at Kendra's ex-boyfriend's house and went home. Just before 2:00 a.m., Kendra and Ms. Johnson spoke on the telephone and Kendra recalled hearing Defendant's voice in the background.

Rogers went to the townhouse sometime the next morning and discovered that Ms. Johnson was not there, which Rogers found to be highly unusual. Rogers testified that, at that time, Defendant told him that his wife had left home in the early morning hours after the two had argued.

Around 8:00 a.m., Kendra tried to call her mother at home and Defendant answered the telephone. Kendra asked to speak with her mother and Defendant replied that he had not seen her mother since 4:00 a.m. Defendant told Kendra that her mother "just got up and left." Kendra then telephoned relatives and she and her cousin drove

2

around town trying to find Ms. Johnson.

Kendra and her cousin discovered that her mother was not at work and they returned to the townhouse. There was not anyone there at that time and Kendra noticed several unusual or out-of-place items and that the thermostat was set at 50 degrees. Kendra found a bottle of expensive tequila on a table in the living room; the tequila did not belong to her or her mother. She also found a decorative drinking glass full of liquid. Going further into the house, Kendra discovered a mop and mop bucket which still contained water. According to Kendra, her mother kept a very neat and tidy house and Kendra knew that she would not have left water in the mop bucket. Kendra went upstairs to her mother's bedroom and discovered it in disarray. The comforter that was normally on the bed was missing, and another comforter had been put in its place; the bed skirt was also missing.

Looking for clues, Kendra pulled the bed away from the headboard. On the headboard, Kendra found a gold-colored can of Miller High Life beer and a pack of cigarettes, both of which she identified as items used by Defendant. In the clothes hamper, Kendra found clean wet towels and testified that her mother would not have put them there because wet towels are prone to mildew.

As Kendra called local hospitals trying to find her mother, Defendant arrived at the townhouse. Defendant went upstairs to the bedroom and became agitated when he saw that the bed had been moved. Kendra noticed that Defendant was drinking out of the same glass that she had seen on the table downstairs. Defendant lay down on the bed and began watching television. Rogers then arrived at the townhouse and he and Defendant left together to look for Ms. Johnson. They returned without finding her and Rogers related that Defendant bought some crack while they had been looking for her. Rogers then left on his own to resume the search.

At about 3:00 p.m., Monroe Police Department ("MPD") Officer Stephen Snowberger arrived at the townhouse in response to a call from Defendant. According to the officer, Defendant said that he and his wife had gotten into an argument at about 3:00 a.m. Defendant explained that, following the argument, Ms. Johnson left in her pickup truck and he had not heard from her since that time. The officer noted that Defendant was drinking and also could smell that he was barbecuing outside. The officer returned to the station and entered the missing person report.

That afternoon, the family was notified by police that Ms. Johnson's pickup truck had been found on the University of Louisiana at Monroe ("ULM") campus in the parking lot of a dormitory, which was not far from the townhouse. The truck was simultaneously discovered by Rogers and a Monroe police officer. Ms. Johnson's purse was found in the truck along with her baseball bat; no gun was found in her

purse or elsewhere in the truck.

At that point, Kendra decided to move the bed to look for further clues. Defendant had been interfering with earlier efforts to do this; each time a family member would go to that room, Defendant would sit or lie on the bed. Some family members, however, were able to distract Defendant while others lifted the mattress. Kendra was not in the room when the mattress was moved, but she came in the bedroom when she heard screaming and saw a sizable bloodstain between the mattress and box spring where the bloody mattress had been flipped over. Blood spatter was also later found on the bedroom wall, television, picture frames and bible, which was placed on top of the television. When Defendant heard the screaming and realized that the blood had been discovered, he ran out the back door of the townhouse and fled.

Police and the family searched the area and Defendant was discovered in an abandoned house not far from the townhouse. A search of a nearby dumpster yielded a black trash bag containing the blood-soaked linens that had been on Ms. Johnson's bed. Various items of men's and women's clothing—belonging to Defendant and to Ms. Johnson—were also recovered.

MPD transported Defendant to the police station and Defendant gave a statement to Detective Benjamin Baw, in which he admitted to the detective that he and his wife had argued at about 2:00 a.m., and he stated "that's when I hit her." At that point, Defendant stopped the interview.

Examination of the [sic] Ms. Johnson's bedroom revealed that bleach had been used to clean one of the walls. Two lines of visible blood on the wall were characterized as "castoff" blood spatter, meaning blood that is flung from a swinging weapon. Similarly, police found blood in the bed of the victim's pickup truck.

Shortly after his arrest, Defendant made a phone call from the jail to his sister, Billie White. Calls from the jail are recorded;[1] and, in the call, Defendant told his sister that "she hit me and I just snapped.... I hit her. I grabbed something and hit." He said that he used a bottle to hit his wife. He also told his sister where he had left the body, and he acknowledged that "I don't think I'll be getting back out [of jail]." Police searched the location mentioned by Defendant, but found nothing. They then realized that Defendant had mistaken the name of the road and, relying on the description of the road by Defendant, they searched another area and found Ms. Johnson's partially decomposed body.

During his time in jail, Defendant spoke with Rogers, who was also in jail at that time. Rogers testified that Defendant admitted that he used a Seagram's Gin bottle to

---

[1] Large signs next to the phone inform the user that the calls are monitored and recorded.

kill his wife. Rogers further stated that "he said they just got into an argument and she went to her purse and he hit her across the—you know, and kept hitting her."

As stated, Defendant was charged with second degree murder and was tried by a jury. During jury selection, Defendant's attorney exercised five peremptory challenges against female prospective jurors on the first panel of prospective jurors and only accepted two female jurors. The prosecutor raised a reverse- *Batson*[2] challenge, arguing that Defendant was not allowed to discriminate against female jurors. The court noted the high percentage of excluded females compared with accepted females and found that the prosecutor had made a *prima facie* showing of discrimination. Defendant's attorney then proffered reasons for excluding the jurors:

> — Williams: Could not give adequate consideration to a manslaughter verdict;

> — Day: not elaborate answers, not wholeheartedly behind her responses concerning burden of proof, right to remain silent, marriage, no connection;

> — Harbor: unsolved murder of her aunt;

> — Billiot: marriage and evidence against the accused, exposure to pretrial publicity;

> — Ramsey—"attentive on answer," recollection about the crime, concern about marriage to victim, shaky on burden of proof.

The prosecutor responded with a variety of arguments directed at the reasons offered by Defendant. The court later considered the arguments on the record. The court accepted Defendant's reasons for jurors Billiot, Harbor and Day, but rejected his reasons for jurors Ramsey and Williams and ordered those jurors reseated over Defendant's objection.

Subsequently, the trial court restored the two peremptory challenges to Defendant and rejected a subsequent *Batson* challenge by the prosecutor when Defendant used one of these strikes against a female juror. Defendant ultimately exercised all of his peremptory challenges.

After the parties questioned the third panel of jurors, the State exercised backstrike peremptory challenges against jurors Ramsey and Williams, the jurors who had been reseated pursuant to the prosecutor's gender-discrimination challenge. These jurors were excused and did not sit on the jury.

---

[2] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L.Ed.2d 69 (1986).

The State presented the evidence as outlined above. In his defense, Defendant elected to testify and explained the long history of his relationship with his wife back to their high school days. Defendant described his problems with drug addiction. He further testified that he had an extramarital relationship with another woman, Pat Lloyd, and that his wife knew about that relationship. Defendant further stated that his wife and mistress had engaged in a physical altercation. Defendant admitted that he and his wife argued regularly about various things, such as money and raising their grandchildren.

Defendant further testified that, on the morning of this incident, he had just returned home from the store and he and his wife had gotten into an argument about his whereabouts on the previous night. He stated that his wife had assumed that he was at his mistress's house. He testified:

> And what brought this incident on—we fussing and arguing and she talking about Pat got AIDS and things like that. I don't know why you messing around with this-she got AIDS and things. And I said, Gail, you know what. Guess what. If she got AIDS, guess who else got AIDS. See what I'm getting at? ... Guess who else got AIDS. And boy that-that struck a nerve. And then, that's when she—I got something for your—and—all this stuff and she reached for her—reached for her purse and that's when I hit her with the bottle.
>
> ... After I hit her with the bottle the first time, the blood, man, I kind of ... kind of lost it.... After that—after that was done, I went in and got the rest of the bottle drinking and what—what I done did? What—I can't say these words but what the—going on. What the-look what I done got myself into and things like that. Then I start, oh shit. Let me—shoot, I got to do something here. That's when I start moving the body. That's why I moved the body because I thought about them kids, man. After I done—after I dropped the body off, I came—I washed out the truck. Came and parked the truck and I came home and start cleaning up. I couldn't let them kids—I wasn't going—I couldn't see them kids—didn't want them kids to come up in there and see—see all that blood. All that blood.

Defendant admitted that he hit his wife first on the hand and she screamed; he then conceded that, at that point, he could have stopped hitting her "if I had been thinking, yes. I probably could have stopped. But I was—I was—I was out of it by then. During that time.... Rage. Anger. Rage. Yes."

Examination of Ms. Johnson's body revealed a blunt injury to her right hand that the medical examiner described as a defensive wound; this was evidently the first injury. Forensic examination showed that Defendant then hit her repeatedly—at least five

6

blows—on the head and face with a bottle. The resulting injuries were severe and any one of them would have caused her death; one of these traumas crushed Ms. Johnson's skull and left a four-inch deep indentation.

Defendant also testified that, after killing his wife, he removed the bed linens, flipped the mattress over and then wiped down the room. He said that he then had a drink, made some telephone calls asking people if they had seen his wife and began barbecuing in the back yard. Defendant explained that he was not trying to hide evidence from the police, but that he "was in the process of cleaning up really for them kids."

By a 10–2 vote, the jury convicted Defendant of second degree murder. The court imposed the mandatory life sentence.

*State v. Johnson*, 57 So. 3d 1087, 1089-93 (La. App. 2 Cir. 2011) (footnotes in original).  The appellate court affirmed Petitioner's conviction and sentence on January 26, 2011.  *Id.*  The Louisiana Supreme Court denied Petitioner's subsequent application for writ of certiorari on December 16, 2011.  *State ex rel. Johnson v. State*, 76 So. 3d 1198 (La. 2011).  Petitioner did not seek further direct review before the United States Supreme Court.  [doc. # 1, p. 4].

Petitioner filed a *pro se* application for post-conviction relief in the trial court on November 2, 2012.  [doc. # 13-1, p. 47].  The trial court denied one claim—failure to admonish the jury or declare a mistrial—on November 16, 2012, because the issue had "been addressed and decided adversely to Petitioner in the course of his direct appeal . . . ."  [doc. # 19-13, p. 46].  The court denied a second claim—ineffective assistance of counsel—on March 6, 2013.  [doc. # 13-2, p. 31].  The court denied Petitioner's final claim—prosecutorial misconduct—on August 20, 2013.  *Id.* at 38.

The Second Circuit Court of Appeal denied Petitioner's ensuing application for supervisory review on October 31, 2013.  [doc. # 19-14, p. 40].  The Louisiana Supreme Court, on July 31, 2014, likewise denied Petitioner's application.  *Id.* at 56.

Petitioner filed the instant Petition on October 13, 2014.  [doc. # 1].  He raises the following assignments of error: (1) insufficient evidence; (2) incomplete trial record; (3) the trial court failed to either admonish the jury or grant a mistrial following prosecutorial misconduct; (4) the jury verdict was not unanimous; (5) prosecutorial misconduct; and (6) ineffective assistance of counsel.  [doc. # 1-1].

The matter is now before the Court.

**Law and Analysis**

**I.      Standard of Review – 28 U.S.C. § 2254**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. § 2254, governs *habeas corpus* relief.  The AEDPA limits how a federal court may consider *habeas* claims. After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is limited to the record that was before the state court[.]"  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  An inmate must show that the adjudication of the claim in state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting

*Williams v. Taylor*, 529 U.S. 362 (2000)).  "The 'contrary to' requirement refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision."  *Id.* at 740.  Under the "unreasonable application" clause, a federal *habeas* court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies the principle to the facts of the prisoner's case."  *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts.  Federal courts presume such determinations to be correct; however, a petitioner can rebut this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

## II.    Petitioner's Claims

A. Claim One: Insufficient Evidence

Petitioner first claims that the evidence presented at trial was insufficient to find him guilty of second degree murder.  [doc. # 1-1, p. 10].  When a *habeas* petitioner asserts that the evidence presented was insufficient to support his conviction, the limited question is whether the state court's decision to reject that claim was an objectively unreasonable application of the clearly established federal law set out in *Jackson v. Virginia*, 443 U.S. 307 (1979).  *Williams v. Puckett*, 283 F.3d 272, 278-79 (5th Cir. 2002).  A conviction is based on sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319.  The *Jackson* inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit."  *Herrera v. Collins*, 506 U.S. 390, 402 (1993).  Thus, a conviction may rest on

9

sufficient evidence "even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence." *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).

Under Louisiana law, second degree murder is defined, in pertinent part, as the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm." LA. REV. STAT. § 14:30.1.  Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." *Id.* § 14:10.

Here, Petitioner does not contend that there was no killing or that he lacked the specific intent to kill.  Instead, he claims that the jury should have returned a manslaughter verdict because the evidence presented showed that he killed the victim "in a fit of anger." [doc. # 1-1, p. 12].  He argues that he was in a "rage" because the victim confronted him about his relationship with another woman, argued with him, and "followed him up and down the stairs . . . ." *Id.*

Louisiana law defines manslaughter, in pertinent part, as a "homicide which would be murder under . . . Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." LA. REV. STAT. § 14:31.  "Sudden passion" and "heat of blood" are not separate elements of manslaughter, they "are mitigating factors that may show less culpability than when a homicide is committed without them." *State v. Brooks*, 839 So. 2d 1075, 1078 (La. App. 2 Cir. 2003) (citing *State v. Lombard*, 486 So. 2d 106 (La. 1986)). The defendant has the burden of proving the mitigatory factors, as well as sufficient provocation,

10

by a preponderance of the evidence.  *Id.*; *State v. Journet*, 629 So. 2d 1387, 1390 (La. App. 3 Cir. 1993).

Invoking *Jackson*, the Second Circuit Court of Appeal held that "the jury was well within its discretion to reject Defendant's argument that his conviction should have been one of manslaughter rather than second degree murder."  *State v. Johnson*, 57 So. 3d at 1095-96.  The court reasoned:

> In the case *sub judice*, Defendant is the sole living witness to the killing. Since Defendant chose to testify, the jury heard his version of the offense in detail. Defendant explained that he and his wife had a habit of arguing and, on the night of her death, his wife was enraged at Defendant because he had suggested that either he or his wife might have AIDS because Defendant's mistress had AIDS. Defendant also told the jury that he struck his wife because he saw her reaching for her purse, implying that she might have been reaching for a weapon, although no weapon was found.
>
> The evidence failed to prove that Defendant acted under provocation sufficient to deprive him of cool reflection; indeed, the evidence showed that Defendant, not the victim, was the provocateur. Even accepting Defendant's version of events as true in its entirety—which the jury clearly did not do—his story was insufficient to reduce his culpability for this brutal crime from murder to manslaughter. Defendant, not his wife, had violated the trust of their marriage and had committed adultery with another woman; his extramarital relationship had apparently been ongoing for some period of time. Further, Defendant, by his own admission, knew that his mistress had AIDS, and he, not his wife, made that point in the argument preceding the homicide. Defendant, not his wife, was the party who was goading and antagonizing the other party to the argument. Simply stated, Defendant offered no evidence that his wife had made any statements to provoke his rage.
>
> Moreover, Defendant went to great lengths to cover up any evidence of the crime, even going so far as to report to the police that his wife was missing, hiding her body and cleaning up the scene of the killing. Defendant's hasty but thorough cleaning job after the crime shows that he had control of himself immediately following his killing of his wife and suggests that whatever provocation he may have been under was not great in degree. Also, Defendant fled from the scene when the crime was discovered and told several different versions of the events to various people.
>
> Finally, we are struck by the brutal nature of the killing. Ms. Johnson's right hand had

11

a traumatic injury that the medical examiner described as a defensive injury, and this was apparently the first injury she suffered. Significantly, Defendant admitted that he could have stopped hitting his wife at that point, but he said that he was "angry" and in a "rage," so he continued to beat her until she was dead. The jury apparently concluded that whatever provocation Defendant was acting under evaporated when he continued his assault after he had incapacitated his wife with his first attack.

*Id.* at 1095.

Petitioner had the burden of proving that the he killed the victim in a sudden passion or heat of blood. The jury, however, rejected Petitioner's contention and rendered a verdict of second degree murder.[3] A review of the state court record shows that the jury's decision was entirely reasonable. Consequently, the undersigned cannot say that the state court's application of *Jackson* was objectively unreasonable. This claim should be **DENIED**.

B. Claim Two: Incomplete Trial Record

Petitioner next claims that he could not adequately appeal the trial judge's decision to grant the State's *Batson* challenges because the trial court record did not include a copy of the *voir dire* transcript. [doc. # 1-1, p. 13]. "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). Where a state has created courts of appeal as "an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant," the state's appeal process must comport with due process. *Evitts v. Lucey*, 469 U.S. 387, 393 (1985). However, due process does not necessarily require that a trial record include a verbatim transcript of all proceedings. *See generally, Griffin v. Illinois*, 351 U.S. 12, 18–20 (1956);

---

[3] A reviewing federal *habeas* court is not permitted to substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the fact-finder. *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985).

*Draper v. Washington*, 372 U.S. 487, 495 (1963) ("Alternative methods of reporting trial proceedings are permissible if they place before the appellate court an equivalent report of the events at trial from which the appellant's contentions arise.").  Instead, the record need only be "adequate" for purposes of the appeal.  *See Mullen v. Blackburn*, 808 F.2d 1143, 1146 (5th Cir. 1987); *Schwander v. Blackburn*, 750 F.2d 494, 497 (5th Cir. 1985).

      To warrant *habeas* relief on a claim that state court transcripts were unconstitutionally inadequate, a petitioner must prove that the missing portion(s) of the transcript actually prejudiced his appeal, and he must support his claims with more than mere speculation.  *Mullen*, 808 F.2d at 1146; *U.S. v. Neal*, 27 F.3d 1035, 1044 (5th Cir. 1994); *Thomas v. Cain*, 2013 WL 5960808, at *5 (E.D. La. Nov. 6, 2013); *MacDonald v. Thaler*, 2010 WL 2640135, at *18 (S.D. Tex. June 30, 2010); *Bozeman v. Cain*, 2010 WL 2977393, at *4 (E.D. La. June 7, 2010), adopted, 2010 WL 2977402 (E.D. La. July 20, 2010).

      Here, the initial appellate record did not include a transcript of the *voir dire* proceedings. *Johnson*, 57 So. 3d at 1098.  The State, however, acknowledged the omission and moved the appellate court to supplement the record to ensure "a full and fair review" of Petitioner's *Batson* claim.  [doc. # 19-12, p. 11].  On August 11, 2010, the court granted the State's motion and directed the trial court clerk to "supplement the record with duplicate certified copies of the transcripts for the voir dire proceedings . . . ."  *Id.* at 15.  The court granted Petitioner forty days to file a supplemental appellate brief.  *Id.*  The trial court supplemented the record with the *voir dire* transcript on August 24, 2010.  [*See* doc. # 19-2, p. 3].  On September 14, 2010, Petitioner acknowledged that he received the *voir dire* transcript.  *Id.* at 16.

      On January 26, 2011, the appellate court recognized that Petitioner received the transcript

13

and used it to file a supplemental assignment of error.  *Johnson*, 57 So. 3d at 1096.  The court

then addressed Petitioner's *Batson* claim and, in so doing, implicitly rejected Petitioner's claim

that the prior omission in the record deprived him of the right to a meaningful appeal.  The

court's implicit rejection was not contrary to, or an unreasonable application of, clearly

established federal law.  This claim should be **DENIED**.

C. Claim Three: Trial Court Error

Petitioner claims that the trial court failed to either admonish the jury or grant a mistrial

following various instances of prosecutorial misconduct.  [doc. # 1-1, p. 14, 19].  Petitioner

contends that the prosecutor committed misconduct when he referred to the incident in question

as "the most heinous crime I've ever seen," when he argued that Petitioner "'hit the victim since

2006,'" when he misquoted the law regarding the burden of proof, when he mentioned

Petitioner's prior convictions, and when he stated that Petitioner "'spent most of his life in

prison.'"  *Id.* at 14-19.

This claim does not involve consideration of any federal or constitutional law.  "Federal

habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural

law unless a federal issue is also presented."  *Leblanc v. Quarterman*, 2008 WL 2330746 at *6

(N.D. Tex. May 28, 2008); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996).  Rather,

"[f]ederal habeas corpus review is limited to errors of constitutional dimension . . . ."  *Castillo v..*

*Johnson*, 141 F.3d 218, 222 (5th Cir. 1998).  In the course of reviewing state proceedings, a

federal court does not sit as a super state appellate court.  *Dillard v. Blackburn*, 780 F.2d 509,

513 (5th Cir. 1986).  Here, consequently, review of Petitioner's claim is not proper.

To the extent that Petitioner's claim can be construed as asserting a claim for denial of

due process, the claim is without merit.  A denial of a motion for mistrial or a failure to admonish only implicates the Constitution if the error results in a fundamental unfairness that fatally infects the trial.  *Matthews v. Cain*, 2010 WL 3210444, at *16 (E.D. La. July 12, 2010) (citing *Lisenba v. California*, 314 U.S. 219, 236-37 (1941)); *see also Webb v. Blackburn*, 773 F.2d 646, 651-52 (5th Cir. 1985) (emphasizing that the inquiry is whether a denial of mistrial "rendered the trial fundamentally unfair in the constitutional sense.").  A petitioner must show that "the trial court's error had a 'substantial and injurious effect or influence in determining the jury's verdict.'"  *Hernandez v. Dretke*, 125 Fed. App'x 528, 529 (5th Cir. 2005) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

Here, in light of the overwhelming evidence against Petitioner, the Court finds that the trial court's decision not to grant a mistrial or admonish the jury did not fatally infect the fairness of Petitioner's trial or have a substantial and injurious effect on the jury's verdict.[4]  This claim should be **DENIED**.

### D. Claim Four: Non-Unanimous Jury Verdict

Petitioner claims that the jury's verdict should not stand because it was not unanimous. [doc. # 1-1, p. 15].  Petitioner admits that "[i]t is certainly the law at this point that the 10 of 12 verdict is legal," but he asks the Court to "reject the rationale" of the existing Supreme Court precedent and hold that a less than unanimous jury vote is unconstitutional.  *Id.* at 15-16.  The Second Circuit rejected this claim on the basis that the Louisiana Constitution and the Louisiana Code of Criminal Procedure require only ten out of twelve jurors to concur.  *Johnson*, 57 So. 3d

---

[4] Of import, although the trial judge did not caution or admonish the jury immediately after the prosecutor's comments, it did instruct the jury that the "statements and arguments made by the attorneys are not evidence."  [doc. # 18-7, p. 24].

at 1099.

In *Apodaca v. Oregon*, 406 U.S. 404 (1972), and *Johnson v. Louisiana*, 406 U.S. 356 (1972), the United States Supreme Court upheld the constitutionality of state laws that permitted criminal defendants to be convicted by a non-unanimous jury vote.  In 2010, the Supreme Court reiterated that, "although the Sixth Amendment right to trial by jury requires a unanimous jury verdict in federal criminal trials, it does not require a unanimous jury verdict in state criminal trials."  *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 766 (2010).

Petitioner's claim here is meritless.  The question before the Court is whether the state court's decision to reject Petitioner's claim and uphold the jury's non-unanimous vote was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.  As is evident, the current, clearly established Supreme Court precedent upholds the validity of less than unanimous jury verdicts in state criminal trials.  The Second Circuit's decision to reject Petitioner's claim was entirely consistent with this precedent.  This claim should be **DENIED**.

E. Claim Five: Prosecutorial Misconduct

Petitioner claims that the prosecutor committed misconduct when he stated that Petitioner "'hit the victim since 2006,'" when he misquoted the law regarding the burden of proof, when he mentioned Petitioner's prior convictions, and when he stated that Petitioner "'spent most of his life in prison.'"  [doc. # 1-1, p. 16-17].  Citing LA. CODE CRIM. PROC. ANN. art. 841,[5] the trial court, on collateral review, denied this claim because Petitioner failed to sufficiently explain his

---

[5] LA. CODE CRIM. PROC. ANN. art. 841 provides: "An irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence."

failure to raise this claim "during the course of the proceedings leading to his conviction and/or on direct appeal."  [doc. # 13-2, p. 31, 38].

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and is adequate to support that judgment.  *See Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997).  This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or *habeas* review.  *Amos v. Scott*, 61 F.3d 333, 388 (5th Cir. 1995).

Procedural default does not bar federal court review of a federal claim raised in a *habeas* petition unless the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is "independent" of federal law and rests on a state procedural bar. *Glover*, 128 F.3d at 902.  A state court expressly bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a defendant's claim.  *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).  To be "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases.  *Id.*

Here, the trial court issued the last reasoned opinion on this issue and, as mentioned, relied on LA. CODE CRIM. PROC. ANN. art. 841, Louisiana's contemporaneous objection rule, in denying Petitioner's claim.  It is well-settled that Article 841 is an independent and adequate state procedural ground that is regularly applied by the Louisiana courts.  *Duncan v. Cain*, 278 F.3d 537, 541 (5th Cir. 2002) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977)).  Accordingly, it appears that Petitioner's claim is immune from federal review.

A petitioner may, however, be excepted from the procedural default rule if he can show

17

"cause" for his default and "prejudice attributed thereto," or if he can demonstrate that the federal

court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice."

*Glover*, 128 F.3d at 902.  To establish cause for a procedural default, a petitioner must

demonstrate that some objective factor external to the defense impeded his efforts to comply with

the state's procedural rule.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  The mere fact that the

petitioner failed to recognize the factual or legal basis for a claim, or failed to raise the claim or

objection despite recognizing it, does not constitute cause for a procedural default.  *Id.* at 486.

Here, Petitioner attempts to demonstrate cause for the default by arguing that his trial

counsel was ineffective for failing to object to the prosecutor's misconduct.  [doc. # 1-1, p. 21].

A petitioner can demonstrate cause for a procedural default if he can show that he was

represented by counsel whose performance was constitutionally ineffective.  *Murray,* 477 U.S. at

488.  Here, however, for reasons discussed below in Section "F," Petitioner's trial counsel did

not render constitutionally ineffective assistance in choosing not to object.  Thus, counsel's

performance does not excuse the procedural bar imposed by the Louisiana courts.[6]

Petitioner's claim is therefore procedurally barred from review absent a showing that a

fundamental miscarriage of justice will occur if the merits of the claim are not reviewed.  *Id.* at

497.  To establish a fundamental miscarriage of justice, Petitioner must provide the Court with

evidence that would support a "colorable showing of factual innocence."  *Kuhlmann v. Wilson*,

477 U.S. 436, 454 (1986).  Petitioner must show that "but for constitutional error, no reasonable

---

[6] Having failed to show an objective cause for his default, the Court need not determine whether prejudice exists.  *See Hogue v. Johnson*, 131 F.3d 466, 497 (5th Cir. 1997) ("The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown.").

fact-finder would have found [him] guilty of the underlying offense." *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997).

Petitioner makes no real argument that a fundamental miscarriage of justice will occur if his claims are not reviewed.  Accordingly, he has failed to overcome the procedural bar to the instant claim.  This claim should be **DENIED**.

F. Claim Six: Ineffective Assistance of Counsel

Petitioner claims that his trial counsel was ineffective for failing to preserve his prosecutorial misconduct claim for appeal (*See* Section "E" *infra*).  The trial court, on collateral review, denied Petitioner's claim because there was "no evidence of ineffective assistance of counsel."  [doc. # 13-2, p. 32].  The court added, *inter alia*, that Petitioner's "guilt was established beyond a reasonable doubt" by his own testimony.  *Id.*  This Court agrees.

Ineffective assistance of counsel claims may be considered under 28 U.S.C. § 2254.  *See Clark v. Thaler*, 673 F.3d 410 (5th Cir. 2012); *Amos v. Thornton*, 646 F.3d 199 (5th Cir. 2011).  Substandard advice of counsel rises to a constitutional violation only if the substandard conduct deprives the petitioner of his constitutional right to a fair trial or deprives the petitioner of some other constitutional right.  *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984).  To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his counsel's actions fell below an objective standard of reasonableness and that the ineffectiveness of counsel prejudiced him.  *Id.*

If the petitioner does not make a sufficient showing as to one prong of the test, the other prong need not be considered.  *Tucker v. Johnson*, 115 F.3d 276, 281 (5th Cir. 1997).  The prongs of the test also need not be analyzed in any particular order.  *Goodwin v. Johnson*, 132 F.3d 162,

172 n.6 (5th Cir. 1997).  Further, "mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue."  *Green v. Johnson*, 160 F.3d 1029, 1042-43 (5th Cir. 1998).

In applying the first prong of *Strickland*, a court should presume that the attorney's actions are encompassed within the wide range of reasonable competence and fall under the ambit of trial strategy.  *See Strickland*, 466 U.S. at 689-90.  The petitioner must show that the performance of counsel fell "outside the wide range of professionally competent assistance."  *Id.* at 690; *Ward v. Whitley*, 21 F.3d 1355 (5th Cir. 1994).

To establish prejudice, the second prong, the petitioner must demonstrate that counsel's actions "were so serious as to render the proceedings unreliable and fundamentally unfair."  *U.S. v. Saenz-Forero*, 27 F.3d 1016, 1021 (5th Cir. 1994); *Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984).  Unreliability and unfairness do not result "if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993); *see also Mangum v. Hargett*, 67 F.3d 80, 84 (5th Cir. 1995).  Accordingly, counsel cannot be ineffective for failing to raise a meritless claim, *Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995), and prejudice generally exists only if the defendant demonstrates that he would have received less jail time.  *U.S. v. Grammas*, 376 F.3d 433, 436 (5th Cir. 2004).

Finally, when review is governed by the AEDPA, review of the state court's resolution of the ineffective assistance of counsel claim is "doubly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009), since the question is "whether the state court's application of the *Strickland* standard was unreasonable."  *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).

Importantly, "[t]his is different from asking whether defense counsel's performance fell below *Strickland's* standard," because the "state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* Consequently, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786. To obtain relief, a petitioner must show that the state court's ruling on the claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

Here, Petitioner claims that trial counsel should have objected when the prosecutor committed the alleged misconduct set forth above. [doc. # 1-1, p. 16-17]. Considering the conclusive evidence of Petitioner's guilt,[7] the Court finds that, even assuming the prosecutor's statements were improper and that counsel did err by failing to object, counsel's errors did not affect the outcome of the trial. In other words, even if counsel had objected and the judge sustained the objections, and even if counsel had then requested a curative instruction, there is no reasonable probability that the jury would have rendered a different decision.

It is also clear, for the same reason, that counsel's decision not to object to the prosecutor's statements did not prejudice Petitioner's appeal. *See Burkett v. Thaler*, 379 Fed. App'x 351, 359-60 (5th Cir. 2010) (ruling that district courts considering issues like the one at bar should consider whether a petitioner can demonstrate a reasonable probability that the trial *and*

_____

[7] Most notably, Petitioner admitted that he killed the victim. To reiterate, he testified that he "hit her with the bottle," that he moved her body, that he "dropped the body off," that he "washed out the truck," and that he "came home [to] start cleaning up" because he "didn't want them [sic] kids to come up in there and see — all that blood." [doc. # 19, p. 2].

appellate proceedings would have differed absent counsel's error).  Accordingly, the state *habeas* court's resolution of this claim was not so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.  This claim should be **DENIED**.

<u>**Conclusion**</u>

For the reasons stated above, **IT IS RECOMMENDED** that the Petition for writ of *habeas corpus* filed by Petitioner Harold W. Johnson, [doc. # 1], be **DENIED and DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the District Judge at the time of filing.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States

District Courts, this Court must issue or deny a certificate of appealability when it enters a final

order adverse to the applicant.  Unless a Circuit Justice or District Judge issues a certificate of

appealability, an appeal may not be taken to the court of appeals.  **Within fourteen (14) days**

**from service of this Report and Recommendation, the parties may file a memorandum**

**setting forth arguments on whether a certificate of appealability should issue.**  *See* 28

U.S.C. § 2253(c)(2).  **A courtesy copy of the memorandum shall be provided to the District**

**Judge at the time of filing.**

     In Chambers, Monroe, Louisiana, this 27th  day of March, 2015.


KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE

23